THE CLEVELAND ELECTRIC ILLUMINATING CO., APPELLEE, *v.*
CITY OF PAINESVILLE, APPELLANT, ET AL.

[Cite as Cleveland Electric Illuminating Co. v. Painesville,
10 Ohio App. 2d 85.]

(No. 822—Decided April 26, 1967.)

*Messrs. Squire, Sanders & Dempsey, Mr. John Lansdale,
Mr. Lee C. Howley, Mr. Donald Hauser* and *Mr. Charles P.
Baker, Jr.,* for appellee.

*Messrs. Dinsmore, Shohl, Barrett, Coates & Deupree, Mr.
James W. Farrell, Jr.,* and *Mr. Wayne Milburn,* city solicitor,
for appellant.

McLAUGHLIN, J. This appeal on questions of law is from a
declaratory judgment of the Common Pleas Court. The action
was filed by the Cleveland Electric Illuminating Company (here-
inafter referred to as C. E. I.). The defendants are the city of
Painesville (hereinafter referred to as Painesville) and the
Painesville Planning Commission. The planning commission
is not a party to this appeal.

The controlling facts are either stipulated or not disputed.
The C. E. I. found that it will be necessary to construct

three *overhead* electric transmission lines from its East-lake power plant west of Painesville, through Painesville to its Nursery substation east of that city. These three lines will carry electricity of 33 KV (33,000 volts), 132 KV (132,000 volts), and 345 KV (345,000 volts). The lines are to traverse, overhead, certain named streets within the city, and are to provide electric service to consumers in communities and political subdivisions other than Painesville, which has its own municipal electric plant. The 345 KV line leads to the Pennsylvania border, there connecting with a similar 345 KV line, thus serving interstate commerce. The C. E. I. lines in Ohio run generally parallel to and adjacent to an Ohio freeway, Route 2.

The original action sought a declaration as to whether Painesville's consent could be withheld. While the action was pending, Painesville passed Ordinance No. 18-65, which provided that an electric public utility must obtain a permit from that city for the construction of such lines, and in no event could a permit be issued to construct lines carrying voltage in excess of 33 KV without placing such lines underground. C. E. I. then filed an amended petition which asked for a declaration that the ordinance was invalid.

The Painesville ordinance is similar in regulatory effect to an ordinance of the city of Euclid. Euclid's ordinance was upheld, and the C. E. I. was refused a writ of mandamus, in *State, ex rel. Cleveland Electric Illuminating Co.,* v. *Euclid* (1959), 169 Ohio St. 476 (3 judges dissenting).

The syllabus of that case reads:

"1. A municipal corporation may prescribe reasonable regulations for the installing of electric power lines through or into its terrritorial limits and may withhold its consent for the installation of such power lines until such regulations are complied with. (Sections 715.27, 4933.13 and 4933.16, Revised Code, construed and applied.)

"2. A municipal ordinance which provides that all electric power lines installed within or through the municipality's territorial limits and carrying greater voltage than 33 KV (33,000 volts) shall be installed underground is not an unreasonable regulation unrelated to the health, safety and welfare of the inhabitants of the municipality."

Since *Euclid,* has come Section 4905.65, Revised Code (ef-

fective October 10, 1963), commonly known as the Hot Wires Statute. It reads:

"(A) As used in this section:

"(1) 'Public utility' means any electric light company, as the same is defined in Sections 4905.02 and 4905.03 of the Revised Code.

"(2) 'Public utility facility' means any electric line having a voltage of twenty-two thousand or more volts used or to be used by an electric light company and supporting structures, fixtures, and appurtenances connected to, used in direct connection with, or necessary for the operation or safety of such electric lines.

"(3) 'Local regulation' means any legislative or administrative action of a political subdivision of this state, or of an agency of a political subdivision of this state, having the effect of restricting or prohibiting the use of an existing public utility facility or facilities or the proposed location, construction, or use of a planned public utility facility or facilities.

"(B) To the extent permitted by existing law a local regulation may reasonably restrict the construction, location, or use of a public utility facility, unless the public utility facility:

"(1) Is necessary for the service, convenience, or welfare of the public served by the public utility in one or more political subdivisions other than the political subdivision adopting the local regulation; and

"(2) Is to be constructed in accordance with generally accepted safety standards; and

"(3) Does not unreasonably affect the welfare of the general public.

"Nothing in this section prohibits a political subdivision from exercising any power which it may have to require, under reasonable regulations not inconsistent with this section, a permit for any construction or location of a public utility facility proposed by a public utility in such political subdivision."

Upon the evidence the trial court found (1) necessity for C. E. I. to build these lines as a public utility facility for the service, convenience and welfare of the public served by C. E. I. in one or more political subdivisions and in interstate commerce; (2) that these lines are to be constructed in accordance with generally accepted safety standards; (3) that these lines

do not unreasonably affect the welfare of the general public within the meaning of Section 4905.65 (B) (1), (2) and (3), Revised Code; and (4) that underground construction of these lines would increase the cost some six and one-half million dollars above overhead construction costs, which, as a practical matter, amounted to a prohibition.

The trial court in effect declared that Section 4905.65 "modified" the *Euclid* decision; that Painesville could not refuse C. E. I. permission to construct these lines; that the underground regulation of the Painesville ordinance was unreasonable, prohibitory and invalid; and that the consent of or a permit from Painesville to the construction and maintenance of these line was not required.

The trial court made other declarations which are not the subject of this appeal, since C. E. I. filed no cross-appeal and Painesville did not assign any of them as error.

The first four assigned errors, treated together, are that the trial court erred in the following respects:

"1. In holding invalid the provisions of Section 6-173-03 of City of Painesville Ordinance No. 18-1965 requiring electric transmission lines carrying energy at voltages in excess of 33 kv to be constructed underground.

"2. In holding valid Revised Code Section 4905.65 to the extent, as found by the trial court, that it purports to prohibit municipalities from exercising the police powers conferred upon them by Section 3 of Article XVIII of the Constitution.

"3. In holding that an electric utility can place its installations in and through municipal streets and lands without the consent of the municipal [ity] and without appropriating a right of way therefor.

"4. In holding that Revised Code Section 4905.65 repealed, by implication Revised Code Sections 723.01, 715.27, 4933.14, and 4933.16."

Our ruling upon the first four assignments of error is dependent upon our construction and application of Section 4905.-65, Revised Code. This section is a general law of state-wide application, and is the latest expressed intent of the state's law-making body on the particular of electric transmission lines. Insofar as earlier statutes constituted a grant of power to the municipality to prohibit the C. E. I. lines, they are repealed

*pro tanto* by the expressed provisions of the later enactment. Section 4905.65 Revised Code, creates an exception to those statutes and must be read *in pari materia* with them.

The legal effect of Section 4905.65, Revised Code, is that C. E. I., "an electric utility," may fulfill its statutory duty to provide service to other than Painesville consumers "in one or more political subdivisions" by means of these C. E. I. lines, which are "public utility facilities," provided they are necessary, are constructed in accordance with the generally accepted safety standards, and do not unreasonably affect the general welfare of the public. When the facilities in question meet these standards, the consent of, or a permit from, the city is unneccessary.

The Painesville permit ordinance is in conflict with Section 4905.65, Revised Code, and the ordinance is not a valid local regulation.

Section 3 of Article XVIII of the Ohio Constitution provides:

"Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws."

That constitutional provision refers to all powers of *local self-government*. The construction of these public utility facilities across the state, transversing many political subdivisions of the state and serving interstate commerce, is not a matter of local self-government. Here, we are dealing with a matter of state-wide and national importance. This construction is of more than local interest and is not a matter for local requlation. The construction of such facilities through a municipality without that municipality's consent does not violate the above constitutional provision.

The proposed construction in the present case is similar in state-wide and national importance to the construction of certain highways. See *State, ex rel. Ohio Turnpike Commission,* v. *Allen,* 158 Ohio St. 168 (involving the Ohio Turnpike); and *Lakewood* v. *Thormyer,* 171 Ohio St. 135 (involving an interstate, or federal aid primary highway).

In both those cases, the Supreme Court held valid the legislation in question on the premise that it involved a matter of

state-wide and national concern and importance which removed it from being subject to local regulation or local self-government.

In the *Turnpike case*, Chief Justice Weygandt said, at page 174:

"* * * The construction of a turnpike across the state hardly can be considered a matter of *local* self-government."

In the *Lakewood case*, Putnam, J., said at pages 146 and 147:

"* * * an f. a. p. highway is more than of local interest and of local regulation. * * *.

"* * * Local self-interest must give way to the general welfare."

See the recent case of *State, ex rel. Klapp*, v. *Dayton P. & L. Co.*, 10 Ohio St. 2d 14, opinion by Zimmerman, J. The first paragraph of the syllabus of such case reads:

"1. Police and similar regulations under the powers of local self-government established by the Constitution of Ohio *must yield* to general laws of statewide scope and application, and statutory enactments representing the general exercise of police power by the state *prevail over* police and similar regulations in the exercise by a municipality of the powers of local self-government." (Emphasis added.)

We have indicated that Section 4905.65, Revised Code, is a general law. We have also indicated that Section 4905.65, Revised Code, must be read *in pari materia* with the earlier statutes specified in assignment of error No. 4, and when so read and construed expresses the legislature's intent to remove from the scope of local police regulation any public utility facilities meeting the standards of that statute.

Therefore, it is our opinion that Painesville's ordinance, with its requirement of underground construction of all of these lines, is not a reasonable regulation. By being unreasonable, this regulation becomes inconsistent and in conflict with Section 4905.65, Revised Code.

When applied to public utility facilities "to be constructed in accordance with generally accepted safety standards," as stipulated here, in other words, with all modern safeguards, and meeting all the standards of Section 4905.65, Revised Code, the ordinance is not sufficiently related to the health, safety and

welfare of the people of Painesville as to be a reasonable exercise of the police power reserved to municipalities by statute or constitutional provision.

Therefore, each of the first four assignments of error is overruled.

The fifth assignment of error is that the court erred in:

"5. Failing to dismiss the petition and supplemental petition on the ground that no judiciable controversy existed between the parties, within the contemplation of the Declaratory Judgment Act, since plaintiff-appellee did not make application to Painesville City Planning Commission for approval of the proposed transmission lines in accordance with Section 713.02."

This assignment of error is based upon a technicality. In pre-action negotiations, Painesville did refuse its approval for these proposed transmission lines. In fact, the filing of the amended petition, which brought into focus the Painesville ordinance, definitely shows that a justiciable controversy existed between the parties.

The fifth assignment of error is, therefore, overruled.

Each of the assignments of error is overruled, and the declaratory judgment of the trial court is affirmed.

*Judgment affirmed.*

JONES, P. J., and LYNCH, J., concur.

McLAUGHLIN, J., of the Fifth Appellate District, sitting by designation in the Seventh Appellate District.