IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

FILED BY CLERK

FEB -8 2007

COURT OF APPEALS
DIVISION TWO

| | | |
|---|---|---|
| CITY OF BISBEE, a municipal corporation of the State of Arizona, | ) ) ) | 2 CA-CV 2006-0106 DEPARTMENT A |
| Plaintiff/Appellee, | ) ) | O P I N I O N |
| v. | ) ) | |
| ARIZONA WATER COMPANY, an Arizona corporation, | ) ) ) | |
| Defendant/Appellant. | ) ) ) | |

APPEAL FROM THE SUPERIOR COURT OF COCHISE COUNTY

Cause No. CV2005-00286

Honorable Wallace R. Hoggatt, Judge

AFFIRMED

John A. MacKinnon, Bisbee City Attorney                                   Bisbee
                                        Attorney for Plaintiff/Appellee

Bryan Cave, LLP
  By Steven A. Hirsch, Mitchell J. Klein,                               Phoenix
  Rodney W. Ott                       Attorneys for Defendant/Appellant

P E L A N D E R, Chief Judge.

¶1      In this quo warranto and declaratory relief action, the trial court granted partial summary judgment in favor of appellee, the City of Bisbee, and against appellant, the Arizona Water Company ("AWC"). AWC appeals from the ensuing judgment, entered pursuant to Rules 54(b) and 56, Ariz. R. Civ. P., 16 A.R.S., Pt. 2. On appeal, AWC argues, inter alia, the Arizona Corporation Commission had exclusive jurisdiction of the issues presented and the trial court erred in granting partial summary judgment in favor of the City. Finding no reversible error, we affirm.

**BACKGROUND**

¶2      In reviewing a grant of summary judgment, we view the facts in the light most favorable to AWC, the party against whom judgment was entered. *Bothell v. Two Point Acres, Inc.*, 192 Ariz. 313, ¶ 2, 965 P.2d 47, 49 (App. 1998). AWC is a public service corporation that provides water service within the City of Bisbee. It is the successor in interest to the Arizona Public Service Company, which previously provided water utility services to the City and to the surrounding, then unincorporated communities. In a 1955 "opinion and order," the Arizona Corporation Commission ("the Commission") authorized AWC's purchase and acquisition of the Arizona Public Service Company's operations in Bisbee and the surrounding areas.

¶3      That 1955 order granted AWC a "Certificate of Convenience and Necessity for the rendition of water public service and the operation of a water public service corporation business" in the surrounding unincorporated areas, including the Townsite of

2

Lowell, the Villages of Tin Town and Don Luis, Mason Addition, Johnson Addition, Bakerville and Cochise Row, but "excepting the Town of Warren and the City of Bisbee." With respect to the City, the Commission "granted an Order preliminary to issuance of a Certificate of Convenience and Necessity . . . subject only to [AWC's] procuring . . . [the] appropriate consents, franchises or permits for water service . . . from the appropriate authorities of . . . the City of Bisbee." At that time, a franchise from Cochise County authorized the provision of water services to the unincorporated areas surrounding Bisbee, excluding the Town of Warren.[1]

¶4      A few years later, in 1959, the City annexed the unincorporated areas mentioned above, including the Town of Warren, bringing Bisbee to its current status. AWC has continued to provide water services to the City since 1955 and several times has been granted various permits for, inter alia, relocating or installing water lines. In 1973, in response to the City's request for a copy of a franchise from the City to AWC, AWC stated it could not "locate a franchise per se" from the City and asked how to proceed. The City apparently made no issue of AWC's lack of a franchise until filing this action in April 2005.

¶5      In its complaint, however, the City claimed that AWC was operating without an "approved and ratified franchise from this City," which would "authoriz[e] its use of the

---

[1]In 1939, the Arizona Edison Company, the predecessor in interest of the Arizona Public Service Company, had obtained a twenty-five-year franchise from Cochise County for the above-mentioned, unincorporated areas. By its terms, that franchise expired in 1964 and was not renewed.

public streets and rights-of-way for utility purposes." It also alleged that "conflicts [existed] between [AWC's] use of the City's streets for water transmission lines and the City's use of these same streets in connection with the City's pending sewer improvement project." AWC admitted that it had never obtained a franchise but denied that it "lack[ed] permission to use [the City's] public streets and rights-of way for utility purposes."

¶6 In moving for partial summary judgment below, the City again claimed, inter alia, that without a franchise, AWC had "no continuing legal right to make use of the public streets and rights-of-way" in Bisbee and that AWC was "legally responsible for the relocation costs associated with the City's sewer improvements." The City also sought a declaration that a broad reservation of rights in the subsurface of certain streets, purportedly retained by AWC's predecessor in interest, was void as against public policy. AWC moved to dismiss the City's complaint pursuant to Rule 12(b)(1), Ariz. R. Civ. P., 16 A.R.S., Pt. 1, arguing the superior court lacked jurisdiction to hear the matter, and alternatively cross-moved for partial summary judgment. Following argument on the motions, the trial court granted the City's motion and denied AWC's motions. Although issues relating to the amount of relocation costs and reimbursement remained unresolved, at AWC's request, the trial court included language of Rule 54(b), Ariz. R. Civ. P., in its judgment, permitting this appeal. While this appeal was pending, AWC applied to the City for a franchise, which the

4

City's electorate approved in September 2006. Thus, AWC is currently operating under a valid franchise.[2]

## DISCUSSION

### I. Jurisdiction of the Arizona Corporation Commission

¶7 AWC argues "[t]he trial court erred when it allowed this action to proceed in violation of the exclusive jurisdiction of the Arizona Corporation Commission." As noted above, AWC moved to dismiss the City's complaint pursuant to Rule 12(b)(1), Ariz. R. Civ. P., claiming the superior court "lack[ed] subject matter jurisdiction" "because the relief requested and the claims brought by the City invade[d] the exclusive jurisdiction of the Arizona Corporation Commission." After hearing argument, the court denied the motion. "We review de novo the superior court's exercise of jurisdiction and any issue of statutory interpretation." *Stapert v. Ariz. Bd. of Psychologist Exam'rs*, 210 Ariz. 177, ¶ 7, 108 P.3d 956, 958 (App. 2005).

---

[2]As noted earlier, the City's complaint included both a quo warranto claim and a request for declaratory relief. AWC contended both here and in its objection below to the City's petition to file a quo warranto action that the City lacked standing to pursue such a claim. *See generally* A.R.S. §§ 12-2041 through 12-2043; *Jennings v. Wood*, 194 Ariz. 314, ¶ 17, 982 P.2d 274, 279 (1999); *Crouch v. City of Tucson*, 145 Ariz. 65, 67, 699 P.2d 1296, 1298 (App. 1984). At oral argument, however, the parties agreed that any issue about quo warranto standing is moot because AWC has since obtained a valid franchise. Accordingly, we do not address this issue.

¶8     AWC maintains "[t]he Arizona Constitution provides the Corporation Commission with broad and pervasive jurisdiction and authority over public service corporations."  It relies on article 15, § 3, which states:

> The Corporation Commission shall have full power to, and shall, prescribe just and reasonable classifications to be used and just and reasonable rates and charges to be made and collected, by public service corporations within the State for service rendered therein, and make reasonable rules, regulations, and orders, by which such corporations shall be governed in the transaction of business within the State . . . .

As the City points out, however, "rates, charges and classifications are not at issue."  And we fail to see how this constitutional provision lends any support for AWC's argument that the Commission had exclusive jurisdiction of this matter.

¶9     In discussing the Commission's jurisdiction in relation to municipal authorities, our supreme court noted, "[i]t is *after* the public utility has secured its rights and privileges and franchises, including those of occupying the streets and alleys of a municipality, that the power of supervision over the public utility by the Corporation Commission is intended to be operative and controlling." *Phoenix Ry. Co. of Ariz. v. Lount*, 21 Ariz. 289, 300, 187 P. 933, 936 (1920) (emphasis added). Therefore, a public utility company must first obtain appropriate permission from the municipality in which it operates before the Commission has exclusive  jurisdiction to regulate the company's particular operations in that locale. When the City filed this action and thereby effectively required AWC to obtain a franchise, AWC had not yet done so.  Although AWC previously operated in Bisbee pursuant to the

6

City's implied consent and therefore was subject to the Commission's regulation, the issues raised here did not fall within the Commission's exclusive jurisdiction.[3]

¶10    Further, and importantly, this action did not involve the type of regulatory authority exclusive to the Commission. In *Qwest Corp. v. Kelly*, 204 Ariz. 25, 59 P.3d 789 (App. 2002), this court summarized the powers of the Commission as follows: "'The [C]ommission's power goes beyond strictly setting rates and extends to enactment of the rules and regulations that are reasonably necessary steps in ratemaking.' In addition to this executive and legislative authority, the Commission has the judicial jurisdiction to hear grievances and consumer complaints." *Id.* ¶ 13, *quoting State ex rel. Corbin v. Ariz. Corp. Comm'n*, 174 Ariz. 216, 218, 848 P.2d 301, 303 (App. 1992) (alterations in *Qwest*); *see also City of Casa Grande v. Ariz. Water Co.*, 199 Ariz. 547, n.3, 20 P.3d 590, 594 n.3 (App. 2001). This action does not invoke or infringe on any of those types of powers.

¶11    Rather, this case is primarily concerned with the rights and obligations of the City vis-à-vis AWC and the issue of which party should bear the costs of relocating equipment. Cases involving similar if not identical disputes have been brought before the

---

[3]AWC cites A.R.S. § 40-282(B) to support its argument that the Commission has "the exclusive jurisdiction . . . to determine the adequacy of any consent, franchise or permit issued by municipalities to public service corporations for the use of public streets and rights-of-way." We disagree. That section provides: "Every applicant for a certificate [of convenience and necessity] shall submit to the commission evidence required by the commission to show that the applicant has received the required consent, franchise or permit of the proper county, city and county, municipal or other public authority." That statute merely supports the point that a public utility must first obtain appropriate permission from a municipality before the Commission can grant it further authority to operate.

7

superior court rather than the Commission. *See, e.g., Paradise Valley Water Co. v. Hart*, 96 Ariz. 361, 395 P.2d 716 (1964); *El Paso Natural Gas Co. v. State*, 135 Ariz. 482, 662 P.2d 157 (App. 1983). Further, our supreme court has ruled that determinations of contractual rights between a public utility and an electric co-operative are within the province of the courts, not the Commission. *See Trico Elec. Coop. v. Ralston*, 67 Ariz. 358, 365, 196 P.2d 470, 474 (1948). In those cases, resolution of the dispute was based on the trial court's determination of the rights and liabilities of the respective parties and did not interfere with the Commission's expertise, which is regulating the *business* of public service corporations. *See Qwest*, 204 Ariz. 25, ¶ 13, 59 P.3d at 794. Because the same can be said here, this action, though not involving any contract claims, was appropriately before the superior court.

¶12 In a related argument, AWC contends "A.R.S. § 40-254(F) precludes the City's suit." That statute provides:

> Except as provided by this section no court of this state shall have jurisdiction to enjoin, restrain, suspend, delay or review any order or decision of the commission, or to enjoin, restrain or interfere with the commission in the performance of its official duties, and the rules, orders or decrees fixed by the commission shall remain in force pending the decision of the courts, but a writ of mandamus shall lie from the supreme court to the commission in cases authorized by law.

According to AWC, this action interferes with the Commission's 1955 decision "directing Arizona Water Company to operate the Bisbee water system, including its facilities, rights-of-way and easements, to provide public utility water services to the area and customers in

8

the City." But, as the City asserts, the 1955 order "granted AWC a Certificate of Convenience and Necessity only for that portion of the previously unincorporated areas that were the subject of a Cochise County franchise agreement at that time," and "[t]hat franchise expired by its terms in 1964." *See* ¶ 3 and n.1, *supra.* Thus, any authority obtained through the 1955 order has since expired.

¶13　　　Even assuming the franchise had not expired by its terms in 1964, neither the City's claims nor the trial court's ruling undermines or interferes with previous orders of the Commission. As the trial court noted, "th[is] action [wa]s not an unlawful collateral attack on any [Commission] decision." And, again, determining the legal rights and obligations of the parties here is not the type of regulatory action exclusive to the Commission. In addition, the trial court did not revoke or limit AWC's authority generally as a public utility company. Thus, the trial court had and properly exercised jurisdiction of this action.

¶14　　　AWC also argues "[t]he City failed to seek administrative recourse before the Commission and thus the trial court lacked subject matter jurisdiction." "Generally, a party must exhaust administrative remedies before appealing to the courts." *Aegis of Ariz., L.L.C. v. Town of Marana*, 206 Ariz. 557, ¶ 38, 81 P.3d 1016, 1026 (App. 2003). Because we have determined the Commission did not have original jurisdiction of this matter, however, the doctrine of exhaustion of administrative remedies does not apply. *See Campbell v. Mountain States Tel. & Tel. Co.*, 120 Ariz. 426, 429, 586 P.2d 987, 990 (App. 1978) ("The

9

doctrine [of exhaustion] applies only when an administrative agency has original jurisdiction.").

### III. Pre-existing property rights

¶15      In opposing the City's motion for partial summary judgment and in support of its own cross motion, AWC argued it did "not need a franchise to operate and maintain its water utility facilities" "when [it] already own[ed] a private property interest" for some of the areas in dispute. AWC then argued it was a successor in interest of the company that had developed the Warren townsite, an area that has since been incorporated into Bisbee, and that through its deed, the company had "maintained [a] fee in 'easement strips' defined as the 'pieces, parcels or tracts of land lying between and around the blocks.'" In other words, AWC maintained that, although the original developer of the Warren townsite had dedicated much of the land it had developed, it had granted only "'an easement of right of way over and on the surface'" of the streets and reserved for itself "any land or ground lying below the surface," and AWC, as successor in interest, had obtained and retained those rights.

¶16      In granting partial summary judgment in favor of the City, the trial court found "[t]he purported reservation of rights . . . [by the development company were] void and unenforceable." AWC now argues "[t]he trial court erred when it held as a matter of law that [it] had no pre-existing utility property rights to continue its provision of water utility

service to portions of the City." "On appeal from a summary judgment we must determine *de novo* whether there are any genuine issues of material fact and whether the trial court erred in its application of the law." *Hawkins v. Ariz. Dep't of Econ. Sec.*, 183 Ariz. 100, 103, 900 P.2d 1236, 1239 (App. 1995). We will affirm if the trial court's ruling is correct on any ground. *MacLean v. State Dep't of Educ.*, 195 Ariz. 235, ¶ 18, 986 P.2d 903, 908 (App. 1999).

¶17 As briefly summarized above, AWC asserts, and the City does not dispute, that the Warren Realty and Development Company (WRDC) was organized "to develop the Warren townsite with electric, gas and water utilities." In a 1906 deed recorded in 1907, that company granted the Warren Company and the general public certain interests in the townsite, including the aforementioned surface rights in the "easement strips." WRDC expressly reserved to itself the right to install and operate water utility facilities in the streets by stating in the deed that use of the "easement strips" by the Warren Company and/or the public shall not unreasonably interfere with its and its successors' and assigns' full enjoyment of the easement strips for "digging, excavating, laying, constructing, maintaining and operating, under, on, over or along the said lands, pipes, tubes, tiles, conduits, subways and tunnels for water, gas, . . . or any other purpose" and "for digging, repairing, constructing, maintaining and operating ditches, canals, flumes, sewers, sewer systems, and systems for the productions, sale, development and distribution of water and gas, on, over, under or along said lands."

11

**¶18**        In 1907, the Warren Company dedicated to the public use its surface rights in the property. But the dedication noted that "[n]othing herein shall be construed to dedicate any greater right, title or interest in said avenues, streets, parks, plazas, public grounds and alleys than was conveyed" to it by WRDC. After that dedication, several other properties were added to the Warren townsite. The Warren Company dedicated its rights in those additions to the public, again subject to the same limitation that no greater right was being conveyed than what had been granted by WRDC. For purposes of summary judgment, the City conceded that AWC was a successor in interest to the property rights that had been originally retained by WRDC, but argued that such reservation was void.

**¶19**        "The general rule is that a dedicator may impose such restrictions and reservations as he may see fit when dedicating his property to the use of the public subject to the limitation that the restriction or reservation be neither repugnant to the dedication nor contrary to public policy." *City of Sierra Vista v. Cochise Enters., Inc.*, 144 Ariz. 375, 379, 697 P.2d 1125, 1129 (App. 1984); *see also* 23 Am. Jur. 2d *Dedication* § 6 (2006) ("dedicator cannot attach to the dedication any conditions or limitations inconsistent with or repugnant to the grant, that take the property from the control of the public authorities, or that are against public policy").

**¶20**        *Cochise Enterprises* involved an attempt by a subdivision developer to maintain ownership and control over sewer lines that were constructed within the public streets of a subdivision. 144 Ariz. at 377-78, 697 P.2d at 1127-28. This court concluded

12

that "[a]ny attempt by [the developer] to reserve to itself the right to the sewer lines and any easement pertaining thereto was void as contrary and repugnant to [a local ordinance] *and* the public policy of the state giving incorporated cities exclusive control over its sewage system." *Id.* at 380, 697 P.2d at 1130 (emphasis added); *see also* A.R.S. § 9-276(A)(3) (authorizing cities to "[b]uild and repair sewers, tunnels and drains").

¶21 Although *Cochise Enterprises* is factually distinguishable from this case and involved an ordinance, by recognizing a public policy of giving cities exclusive control over their sewage systems, that case lends support for the City's argument that WRDC's reservation was void as against public policy. Further, several other courts have ruled that attempted reservations of underground street rights for utility purposes were void and unenforceable. *See West Texas Utils. Co. v. City of Spur*, 38 F.2d 466, 467-68 (5th Cir. 1930) (reservation clause that attempted to give utility right "to make all necessary excavations, dig all necessary holes, and do all things necessary to construct, maintain, operate and repair . . . [telephone and electric poles and lines] over and across any and all streets and alleys . . . should it at any time desire to do so," was void as against public policy); *Village of Grosse Pointe Shores v. Ayres*, 235 N.W. 829, 831-32 (Mich. 1931) (dedication of roads that limited utility installation "circumscrib[ed] the future freedom of action of the authorities to devote the street to the wants and convenience of the public" and was therefore "void as against public policy"); *Kuehn v. Village of Mahtomedi*, 292 N.W. 187, 190 (Minn. 1940) ("an individual [may not] by reservation withhold from the

13

municipality the sovereign power incident to the public use of streets and highways"); *City of Camdenton v. Sho-Me Power Corp*, 237 S.W.2d 94, 97 (Mo. 1951) (affirming trial court's declaration that "'the attempt of the dedicators . . . to reserve control over the utility rights in the streets . . . [was] illegal and void'"), *quoting* trial court in case; *Bradley v. Spokane & I.E.R. Co.*, 140 P. 688, 690 (Wash. 1914) ("The reservation in the dedication to general municipal purposes such as the laying of 'water and gas pipes . . .' would be so repugnant to the character of these streets and alleys as public ways, by seeking to take away from the city the power to exercise control over these streets, as to contravene a sound public policy, and for this reason we think it must be held absolutely void.").

¶22        As AWC points out, not every jurisdiction is in agreement on this issue, and some courts have found certain private reservations in subsurface street rights valid and enforceable. *See, e.g., Wofford Heights Assocs. v. Kern County*, 32 Cal. Rptr. 870, 874 (Cal. Dist. Ct. App. 1963) (reservation of an *easement* "to use the subsurface" found valid); *Canda Realty Co. v. Borough of Carteret*, 42 A.2d 859, 863 (N.J. Ch. 1945) (qualified dedication of streets that reserved the right to "from time to time" construct and maintain sewers was "lawfully made"); *N. Spokane Irrigation Dist. No. 8 v. County of Spokane*, 547 P.2d 859, 860, 861, 863 (Wash. 1976) (recognizing a reservation is void if it "unreasonably interfered with the municipality's use and control of the streets," but finding county had failed to show that "reservation to lay down and maintain water pipes in the dedicated streets" unreasonably interfered with its "use, control or regulatory powers over the streets").

14

¶23     But those cases, on which AWC relies, involved reservations that were much more limited in scope than the attempted reservation of rights by WRDC. That company did not merely attempt to retain an easement to periodically use the subsurface area or to reserve the right to maintain a single utility. Rather, it attempted to retain *exclusive* authority to dig, excavate, and construct pipes, conduits, subways, and tunnels "for water, gas, . . . or any other purpose." *See* ¶ 17, *supra*. WRDC also sought to retain exclusive control over "sewer systems" and the "development and distribution of water and gas on, over, under or along said lands." *Id*.

¶24     We agree with the City that such a broad reservation is against Arizona public policy, which recognizes that municipalities validly may exercise their police powers to control sewage in the interest of public health and safety. *See Cochise Enters.*, 144 Ariz. at 380, 697 P.2d at 1130 ("The construction, maintenance and repair of sewers may be provided by ordinances and sustained as a valid exercise of the police power in the interest of public health."). As a well known commentator has observed:

> [I]n many of its aspects the establishment and efficient maintenance of a sewer system is an exercise of the police power for the protection and promotion of the public health and safety. . . . The right of a municipality to exercise this power is considered of such importance to the welfare of the public that it cannot be contracted or granted away.

11 Eugene McQuillin, *The Law of Municipal Corporations* § 31.10, at 196-97 (3d ed. 2000).

¶25    In addition, as the City notes, "[t]he public policy of this state, as expressed in its statutes, has long granted to cities the exclusive authority to prevent encroachments and obstructions in their streets."  Section 9-254, A.R.S., adopted in 1901, states: "Upon filing a map or plat, the fee of the streets, alleys, avenues, highways, parks and other parcels of ground reserved therein to the use of the public vests in the town, in trust, for the uses therein expressed."  For purposes of municipal corporations generally, the term "streets" includes "so much beneath the surface as is necessary for a foundation for the surface and for water mains, gas pipes, sewer pipes and conduits of various sorts."  10A Eugene McQuillin, *The Law of Municipal Corporations* § 30.06, at 237 (3d ed. 1999); *see also* 11 *id*. § 31.18, at 223 ("The use of a public street or alley for sewer or drainage purposes is necessarily incident to the use for which streets and alleys are open and laid out . . . .").

¶26    Here, WRDC's reservation of rights, inherited by AWC as successor in interest, essentially sought to retain total control of the streets and their subsurface, except for a limited "easement of rights of way over and on the surface."  That reservation was repugnant to the purpose of a public street and contrary to public policy.  *See* 11A *id*. § 33.10.20, at 343 ("If a condition or reservation in the dedication of lands for streets tends to hamper public control, it is usually regarded as against public policy and invalid.").

¶27    AWC also argues its "longstanding and pre-existing utility property rights are not contrary to public policy" because, inter alia, they "do not preclude the City from controlling access to the street" and AWC "has always respected the[] City['s] activities."

16

And, based on the limited facts before us, apparently AWC and the City peacefully co-existed for many decades until the City commenced its sewer improvement project. Still, we agree with the City that the reservations included in the 1906 deed attempted to "retain complete sovereignty over all uses of the[] public streets" and that the "attempt to control the full array of rights and responsibilities that may be associated with a public roadway is fundamentally inconsistent with the nature of a public street and is legally unenforceable." Thus, although AWC apparently has cooperated with the City over the years and been respectful of its authority, the reservation itself is void as against public policy. *Cf. City of Elk City v. Coffey*, 562 P.2d 160, 162 (Okla. Civ. App. 1977) ("it is the language . . . of the grant or reservation that controls its purpose"). Accordingly, the trial court did not err in so ruling.[4]

## IV. Necessity of franchise

¶28 AWC also argues "[t]he trial court erred when it held that [AWC] needed a franchise to continue providing water utility service to the City." It argues that even absent any franchise, "consent given and permits issued by the local government can and, in this

---

[4]We note AWC claims to have retained rights in other portions of the City beyond the area that was formerly the Warren townsite. The trial court found those purported rights either "immaterial because no competent, admissible evidence ha[d] been presented concerning what interest AWC may now have," or invalid because the grantor had attempted to reserve rights that had already been transferred to another entity. AWC now argues "[s]ummary judgment was inappropriate because substantial questions of material fact exist regarding the scope of [its] prior utility property rights." But, because we have determined the reservations were void as against public policy, it is not necessary to determine "the full extent and effect of the[] prior grants and reservations," as AWC asserts.

case, do confer upon the utility valid rights to operate within or below public rights-of-way." AWC further argues, "[f]or over fifty years, the City has routinely consented to and permitted [AWC's] use of municipal property in conjunction with [AWC's] water service within the City."

¶29 A franchise is a "special privilege" conferred by municipalities "to public service corporations . . . for the use of the streets . . . to use them in a manner not available to ordinary citizens of common right." *Ne. Rapid Transit Co. v. City of Phoenix*, 41 Ariz. 71, 82, 15 P.2d 951, 955-56 (1932); *see also* A.R.S. § 40-283(A) ("[W]ithin the confines of municipal corporations the use and occupancy of streets shall be under rights acquired by franchises . . . ."). In order to obtain a franchise, a public service corporation must submit a proposed franchise to the municipality, and if the municipality deems the franchise beneficial, it refers the franchise proposal to the public for a general election, as ultimately occurred here. A.R.S. § 9-502(A), (B).

¶30 In granting partial summary judgment in the City's favor, the trial court concluded as a matter of law that, "[u]nder Arizona law, a public service utility may obtain the right to use the city property for its purposes only by a franchise approved by the city's voters." The court cited A.R.S. § 40-283(A) in support of that conclusion. That section, which is entitled "[t]ransmission lines; use of public streets for utility rights-of-way; notice; election," provides in subsection (A):

> Any person engaged in transportation or transmission business within the state may construct and operate lines

18

connecting any points within the state and connect at the state boundary with like lines, *except that within the confines of municipal corporations the use and occupancy of streets shall be under rights acquired by franchises according to law* or licenses pursuant to title 9, chapter 5, articles 1.1 and 4 and subject to control and regulation by the municipal authorities.

(Emphasis added.)[5]  Although it may not be clear that a water utility company is "engaged in transportation or transmission business," this statute implies that a franchise from a municipality is necessary to operate in the municipality's streets.

¶31        AWC argues, however, that not only is § 40-283(A) ambiguous, but also that A.R.S. § 40-282 "permits a utility to receive the rights to operate in a municipality by consents and permits, in addition to a franchise." That statute states in pertinent part:

> Every applicant for a certificate [of convenience and necessity] shall submit to the commission evidence required by the commission to show that the applicant has received the required consent, franchise or permit of the proper county, city and county, municipal or other public authority.

§ 40-282(B).  AWC emphasizes that the Commission will accept evidence of either "consent" or a "permit" in addition to that of a franchise and points out "[m]any Arizona municipalities simply choose not to issue franchises as they are not required for the operation of a water utility so long as the utility has the prior property rights, consents or permits."

---

[5]The licenses to which the statute refers deal specifically with cable television systems, *see* A.R.S. §§ 9-505 through 9-510, and industrial gas pipelines, *see* §§ 9-551 through 9-554.

19

¶32     That the Commission can accept other types of permission, however, does not negate a municipality's right to control its streets and to require a franchise. Section 40-282, on which AWC relies, merely addresses the prerequisites for obtaining a "certificate of convenience and necessity." Such certificate must be "obtained from the commission" before the construction of a public utility. A.R.S. § 40-281(A). "Once granted, the certificate confers upon its holder an exclusive right to provide the relevant service for as long as the grantee can provide adequate service at a reasonable rate." *James P. Paul Water Co. v. Ariz. Corp. Comm'n*, 137 Ariz. 426, 429, 671 P.2d 404, 407 (1983). That the Commission may accept alternative forms of approval before conveying a certificate does not divest a municipality of its right to grant or deny permission to a utility that will occupy its streets "in a manner not available to ordinary citizens of common right." *Ne. Rapid Transit Co.*, 41 Ariz. at 82, 15 P.2d at 955-56 (also stating that despite the Commission's authority to regulate public utilities, "the right to grant franchises to public utilities to occupy the streets and alleys of incorporated cities and towns still remains in the municipal authorities").

¶33     By filing this action, the City was clearly requiring AWC to obtain a franchise, which the City has the power to do. *See id.* at 82, 15 P.2d at 955. Thus, contrary to AWC's assertion, this no longer is one of the "numerous instances where Arizona public service corporations do not have franchises, but yet operate under Commission regulation with consent from the appropriate governmental authority."

¶34 Further, as the trial court pointed out, "[g]rants by the City to AWC of permits to use the streets to work on the water system, or even requests by the City to AWC to work on, replace, or modify certain aspects of the water system, neither satisfy nor dispense with the requirement for a franchise" once the City imposed that condition.[6] The Arizona Constitution provides: "No grant, extension, or renewal of any franchise or other use of the streets, alleys, or other public grounds, or ways, of any municipality shall divest the State or any of its subdivisions of its or their control and regulation of such use and enjoyment . . . ." Ariz. Const. art. XIII, § 6. Based on that authority, we agree with the trial court that the City "retains its ultimate control over its streets and grounds—including the legal right to require a franchise to allow AWC the long-term use of those streets and grounds—despite having granted AWC temporary permits in the past." Thus, although the trial court's ruling was overbroad in requiring franchises for all public utility operations, we cannot say the trial court erred in concluding that, on the City's request, AWC was obligated to obtain a franchise in order to continue its water service operations in Bisbee.[7]

---

[6]As the City points out, any previous work permits granted by "City staff members" "are not equivalent to approval by the Mayor and Council or by the electors of this City, as required by law." *See* A.R.S. § 9-502 (requiring that a franchise be approved by a majority of the electorate before it can be granted); *see also Iowa Elec. Light & Power Co. v. Inc. Town of Grand Junction*, 250 N.W. 136, 140 (Iowa 1933) (finding permission by city without vote of electorate insufficient, and water company had no rights in streets without a valid franchise).

[7]AWC relies on *City of Mesa v. Salt River Project*, 92 Ariz. 91, 373 P.2d 722 (1962), to support its argument that the trial court erred in declaring AWC needed a franchise. In *City of Mesa*, the City wanted to provide electric service to the exclusion of the "District," which was "a political subdivision of the state." *Id.* at 96-97, 373 P.2d at

## V. Relocation costs

¶35      Finally, AWC argues "[t]he trial court erred when it held that [AWC] was obligated to pay relocation costs related to the City's sewer improvements." In its conclusions of law, the trial court stated, "[a] public utility is legally required to assume the costs of relocation in the event of any conflict between the utility's uses and the City's public uses of its public streets." It thus concluded that "AWC is responsible for the costs of relocation associated with the City's sewer improvements."

¶36      Arizona recognizes as a general rule "that a city or county has the police power to require a utility to relocate its facilities at its own expense for road improvements made by the city or county." *See Paradise Valley Water Co. v. Hart*, 96 Ariz. 361, 364, 395 P.2d 716, 718 (1964). Further, "the well settled common-law rule provides that a public utility accepts franchise rights in public streets subject to an implied obligation to relocate its facilities at its own expense, when required for a necessary public use." *El Paso Natural Gas Co. v. State*, 135 Ariz. 482, 483, 662 P.2d 157, 158 (App. 1983).

¶37      AWC contends those general propositions do not apply here because the utilities in those two cases had franchise agreements "that expressly required payment" by

---

726. As AWC points out, the court found that a municipality does not have "an exclusive right to control its streets to the exclusion of the state." *Id.* at 103, 373 P.2d at 730. We agree that Bisbee cannot control its streets to the exclusion of the state, but we fail to see how that argument applies here. Because the issue in *City of Mesa* arose out of a conflict between city rights and state rights and because that conflict does not exist here, *City of Mesa* lends no support to AWC's argument.

the utility. AWC asserts "the only way [it] could be obligated to pay relocation costs . . . is through a contractual agreement," and here, it was not operating with a franchise or any other "contractual arrangements that expressly required payment." But, even when a public utility has no formal contractual obligation to assume relocation costs, "[a] municipal corporation has no right directly or indirectly to burden itself or its citizens with the cost of removing and replacing the structures and appliances of public service companies that may necessarily be interfered with in laying sewers in the streets." 39 Am. Jur. 2d *Highways, Streets and Bridges* § 316 (2006). Instead, those utilities that occupy the streets—on the surface or subsurface—"may be required to adapt themselves to regulations made in the exercise of the police power." *New Orleans Gaslight Co. v. Drainage Comm'n of New Orleans*, 197 U.S. 453, 461, 25 S. Ct. 471, 473-74 (1905). And, just as "[t]he drainage of a city in the interest of the public health and welfare is one of the most important purposes for which the police power can be exercised," *id*. at 460, 25 S. Ct. at 473, the same can be said of a municipality's public sewer system.

¶38    Although most cases discussing relocation costs do involve franchise obligations, public utilities have been required to assume relocation costs despite no affirmative contractual obligation to do so. *See AT & T Corp. v. City of Toledo*, 351 F. Supp. 2d 744, 747 (N.D. Ohio 2005) (easement granted by city to utility was "implicitly subject to [city's] continuing duty and right under the police power to engage in . . . construction activities . . . for the preservation of the public health and safety, requiring

23

[utility] to relocate its telecommunications cable at its own expense"); *Anderson v. Fuller*, 41 So. 684, 688 (Fla. 1906) (because any rights to occupy the public streets "are at all times held in subordination to the superior rights of the public," city's sewer contractor could not assume costs of removal and replacement of conflicting lines).

¶39    Thus, because a utility's right in the surface or subsurface of public streets is subordinate to the public's right to health and safety and subject to the government's police power, AWC must assume the costs of relocation here. *See S. Cal. Gas Co. v. City of Los Angeles*, 329 P.2d 289, 291 (Cal. 1958) ("the established rule that a utility's rights in the public streets are taken subject to the paramount right of public travel . . . applies between public utilities and municipal corporations using the streets for sewer purposes"). That AWC's rights in the streets heretofore were not formally established through a franchise and that AWC had no franchise or other contractual obligation to pay for relocating its facilities does not relieve it of the common law obligation to assume the relocation costs. As the City points out, it is illogical that a public utility that is properly authorized by franchise to operate within a city would have greater obligations than a public utility that formerly has not been authorized through a franchise agreement.

¶40    AWC's remaining argument on this point is that, "[b]ecause [AWC] ha[s] prior utility property rights, it does not have an obligation to pay for utility relocation costs." But, as we have already concluded, the reservation of rights by WRDC, now claimed by AWC as successor in interest, is void as against public policy. Thus, we do not further address this

24

argument. For the foregoing reasons, we affirm the trial court's conclusion that "AWC is responsible for the costs of relocation associated with the City's sewer improvements."[8]

## DISPOSITION

¶41 To the extent that it is consistent with this opinion, the judgment of the trial court is affirmed.

_____
JOHN PELANDER, Chief Judge

CONCURRING:


_____
JOSEPH W. HOWARD, Presiding Judge


_____
GARYE L. VÁSQUEZ, Judge

---

[8]We note that the facts relating to the City's sewer improvement project and the precise ways in which it intersected with AWC's water lines are not before this court. As the City concedes,

> [t]he determination of the full and appropriate quantification of the damages . . . is the subject of the City's First Amended Complaint, now pending. The resolution of the ultimate damage issue will raise a number of factual questions, but these are not included within the partial summary judgment order that has been designated as a final judgment for purposes of this appeal.

25